Thomas J. Flaherty
Attorney at Law, OSB 74096
3032 SE Rood Bridge Drive
Hillsboro, Oregon 97123
(503) 245-2500; Fax: (503) 644-8912
stahlco@teleport.com
Attorney for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CARL L. SEALEY and DONALD W. BARR,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 05-909C<br>Judge Firestone<br><br>PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS |

**STATEMENT OF FACTS**

Plaintiffs Carl L. Sealey ("Sealey") and Donald W. Barr ("Barr") are each retired members of the U.S. Marine Corps Reserve. Chief Warrant Officer (CWO-5) Sealey served for forty-three years, mainly with the Sixth Engineer Support Battalion (6th ENG SPT BN), Fourth Service Support Group (4th FSSG), Fourth Marine Division (4th MAR DIV), Portland, Oregon, a Marine Corps reserve unit. He also spent ten years on active duty with the Seventh Marine Expeditionary Brigade (7th MEB), Marine Corps Base, Twenty Nine Palms, California and Marine Forces Pacific at Camp Smith, Hawaii, both active duty Marine Corps organizations. During most of his service with the 6th Engineer Support Battalion he served as the battalion heavy equipment platoon commander. For many years he owned and operated a truck repair business in Portland, Oregon. This truck repair business constituted his civilian employment.

Master Gunnery Sergeant (M Gy Sgt) Barr also served in the 6th Engineer Support Battalion for 26 years. For most of those years he served as the platoon sergeant for the battalion heavy equipment platoon. In civilian life his occupation was as a heavy equipment operator for various heavy equipment operating companies.

Sealey and Barr normally drilled with the engineer battalion one weekend per month and went on active duty (mainly to Marine Corps Base Camp Pendleton, California and Marine Corps Base, Twenty Nine Palms, California) two weeks per year. CWO-5 Sealey went on extended tours of active duty for months at a time from 1987 to and after Operations Desert Shield and Desert Storm until he retired in 1998.

In 1985 the Marine Corps adopted the Logistics Vehicle System also known as the "Dragon Wagon," an articulated tractor-trailer vehicle used for hauling heavy logistical items such as conex boxes, communications trailers, and other heavy objects used to support a Marine Expeditionary Brigade or Marine Expeditionary Force during combat operations and/or training. The problem with the Dragon Wagon was that the tractor trailer articulated coupling had to be disassembled before it could be loaded upon a ship of the Maritime Prepositioned Ship (MPS) fleet at a port where there were no dock facilities for driving on and/or off an MPS ship. It took a U.S. Marine Motor Transport Battalion team approximately ninety (90) minutes to uncouple the articulated tractor trailer connection before loading each Dragon Wagon onto an MPS ship, ninety (90) minutes to reconnect the tractor and trailer after the Dragon Wagon was loaded, ninety (90) minutes to uncouple the connection for unloading, and another ninety (90) minutes to reconnect the articulation for use. This procedure presented a totally untenable time delay in the loading and unloading of MPS ships in an operational combat theater. None of the lifting systems in use were effective in lifting the entire Dragon Wagon on and off the MPS ships.

During a period of active duty in February 1986 at MEB Twenty-Nine Palms with 7th MEB, CO-4 Sealey was asked by the MEB G-4 (Assistant Chief of Staff, Logistics) to research the problem and attempt to come up with a viable solution. CWO-4 Sealey immediately called MGy Sgt. Barr at his home in Portland, explained the problem, and asked for his help in coming

up with a solution for the loading and unloading of the Dragon Wagon on and off MPS ships.

Over the next few days Barr made rough drawings of what was to become known as the Crane Lifting System (CLS). The CLS consisted of an overhead steel spreader bar, spreader cables attached to the spreader bar and to a skeleton lifting platform that a Dragon wagon drove onto and was lifted on and off MPS ships. The articulation did not have to be uncoupled. MGy Sgt Barr was not on active duty when he designed the CLS. Upon his release from active duty and his return home to Portland in March 1986, CWO-4 Sealey met with MGy Sgt. Barr in a local Portland tavern and they finalized the CLS concept and drawings. Blueprints were then made and the CLS concept and drawings were presented to the 7th MEB G-4 as a viable solution to the loading and unloading problem of the Dragon Wagon aboard MPS ships.

The genius of the CLS was soon recognized by the 7th MEB G-4 and the 7th MEB commander, Brigadier General Gene Deagan who ordered Sealey and Barr to U.S. Naval Station Blount Island, Florida, an MPS station, with a small team of 7th MEB engineers. Within a few short months, from January to May, 1988, Sealey and Barr and their team of U.S. Marine engineers, built a prototype of the CLS and tested it. The U.S. Navy also had it tested and certified by its engineers. The CLS passed all load bearing tests with flying colors. The U.S. Navy and the U.S. Marine Corps immediately (June 1988) adopted Sealey's and Barr's CLS and directed them to manufacture two CLSs for each MPS ship for a total of 28 more CLSs. Their system was put into immediate use by the U.S. Navy and Marine Corps in June of 1988, and has been in continuous use on board MPS ships ever since.

During the same time period, the U.S. Marine Corps had set aside $5,000,000.00 from its project development budget to design a system for loading and unloading the Dragon Wagon on and off MPS ships. It estimated that it would take two years just to design such a system.

Sealey and Barr designed, tested and manufactured the CLS for the Dragon Wagon in six months at a total cost of $880,000.00, thus saving the Navy and Marine Corps $4,120,000.00 at a minimum, just on the design of the system, plus another several million for the construction of a prototype, testing of the prototype, and for manufacturing of a loading and unloading system.

The U.S. Army also adopted the CLS for the loading and unloading of its Dragon Wagon on and off its APS ships.

Thereafter on May 27, 1988, Sealey and Barr filed their application for beneficial suggestion award pursuant to Marine Corps Order 1650.17F. That order provides for a financial reward for inventions, scientific achievements and productivity excellence which benefit the combat readiness, economy and efficiency of the Marine Corps and/or Navy. Benefits are described as tangible and intangible. Tangible benefits are those measured and expressed in terms of dollar value. Intangible benefits are those which cannot be expressed in specific monetary value.

The order further provides that the Marine Corps is required to measure the value and benefit to the Navy and/or Marine Corps during the first several years of its use. The awards scale for tangible benefits is based upon the estimated first year benefits in terms of labor, materials, and cost of services, or if benefits cannot be adequately measured in the first year, they are to be measured for the two or three years thereafter. For benefits up to $10,000.00 the amount of the award is ten percent (10%) of benefits. For benefits of between $10,000.00 and $100,000.00 the amount of the award is $1,000.00 for the first $10,000.00 plus three percent (3%) of benefits over $10,000.00. For benefits of $100,001.00 or more, the award is $3,700.00 for the first $100,000.00 plus .5% of benefits over $100,000.00.

For example, if the benefit to the Marine Corps was $5,000,000.00 in terms of the savings in labor, materials and cost of services, the award under the formula would be $248,700.00 based on the following calculations:

| | | |
|---|---|---|
| | $ 5,000,000.00 | |
| - | 100,001.00 | $ 3,700.00 |
| | 4,900,000.00 | |
| x | .05 | |
| | $ 245,000.00 | 245,000.00 |
| | | $ 248,700.00 |

If the benefit to the Marine Corps was $10,000,000.00, the award under the formula would be $498,700.00 based on the following calculations:

| | | |
|---|---|---|
| | $10,000,000.00 | |
| - | 100,000.00 | $ 3,700.00 |
| | 9,900,000.00 | |
| x | .05 | |
| | $ 475,000.00 | 475,000.00 |
| | | $498,700.00 |

Neither the Marine Corps nor the Navy ever calculated the benefits accruing to them by and through the use of the CLS for the CVS in savings for labor, materials and services for 1988, 1989, 1990 or 1991 until February 22, 1996. At that time the tangible benefits for a three-year period were calculated to be $4.2 million for an award of $208,700.00, or for a one-year period the benefits were calculated to be $2.0 million for an award of $98,700.00. The intangible benefit award suggested was between $5,000.00 and $10,000.00.

No mention was ever made by the Marine Corps or Navy of the $25,000.00 limit of 10 USC Section 1124 until October 1, 2002. Marine Corps Order 1650.17F made no mention of 10 USC Section 1124. Apparently the Marine Corps drafted this order, made it effective on December 11, 1986, and distributed it either knowing it was in contravention of 10 USC Section 1124 or not knowing of the existence of that statute. The Marine Corps apparently did not become aware of the existence of the statute until October, 2002 after its own order had been in existence for over twelve and one-half years, or it either waived its application or ignored it.

After Sealey and Barr filed their application for a beneficial suggestion award on May 27, 1988, it was endorsed up the Marine Corps chain of command by the Commanding General of the 7th MEB and the Commanding General Fleet Marine Forces Pacific, which command has been renamed Marine Forces Pacific. Thereafter Sealey's and Barr's beneficial suggestion request languished in a bureaucratic miasma for four plus years.

In October of 1992 the Marine Corps notified Sealey and Barr that it needed additional information in order to evaluate this beneficial suggestion. Sealey and Barr resubmitted their photographs, drawings, blueprints, videotape, engineering testing data, and all of the other information they had concerning the CLS for the LVS to the Marine Corps. Thereafter the application again languished in a bureaucratic jungle for another two years. Finally, on March 21, 1994, Sealey and Barr were notified by the Marine Corps that the CLS for the LVS was not recommended for adoption, even though the U.S. Marine Corps and U.S. Navy had actually adopted the CLS/LVS in May of 1988 and it had been in continuous use in both services for MPS ships since May 1988, and even though the CLS/LVS had also been adopted for use by the U.S. Army. The Marine Corps denied Sealey's and Barr's beneficial suggestion and closed its file on their application for a financial award.

Shortly thereafter, on April 26, 1994, the Commanding General, Marine Forces Pacific, informed the Commandant for the Marine Corps that the Marine Corps' recommendation that the Marine Corps not adopt the CLS/LVS was absurd because the CLS/LVS had been in actual use for six years, that it was very successful and benefitted Marine Forces Pacific and the entire Navy and Marine Corps greatly. That command recommended that Sealey's and Barr's beneficial suggestion award application be put on a fast track for approval.

Again the application languished for another two years. A Marine Corps brief dated February 22, 1996 calculated $4.2 million in tangible benefits to the Navy, Army and Marine Corps for 1988-1991, and recommended an award of $208,700.00 in tangible benefits and an award of $5,000.00 to $10,000.00 for intangible benefits. Finally, in November, 1996 the Marine Corps recommended that Sealey and Barr be awarded $13,200.00 for tangible benefits and $10,000.00 for intangible benefits.

On December 21, 1999 Barr received a check for $1,575.00 and Sealey received a check for approximately $6,000.00 on approximately the same date.. Their claim was then closed and they received no further information on their application.

Upon further inquiry to their U.S. Congressman in 2000 and 2001, they were informed by the Marine Corps on October 18, 2002, that 10 USC Section 1174 limited their award to $25,000.00 and they were sent a check for $13,200.00.

The Marine Corps admitted in its correspondence that Sealey's and Barr's beneficial suggestion was of great benefit to the U.S. Marine Corps, the U.S. Navy, and the U.S. Army, and that they had been treated very badly.

In 1988 Sealey and Barr made an application with the U.S. Patent Office for a patent for their CLS. Their application was turned down by that office because the CLS had already been put in general public use by the U.S. Navy and Marine Corps.

Plaintiffs have brought this action both as private citizens and as members of the U.S. Marine Corps Reserve.

**LEGAL ARGUMENT**

1. <u>COURT HAS JURISDICTION OF PLAINTIFF'S CLAIMS</u>.

28 USC Section 1491(a)(1) states:

> "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort ...."

Plaintiffs have alleged an action against the United States for breach of contract, misrepresentation and quantum meruit or unjust enrichment.

It is the nature of the plaintiffs' claims which determines the jurisdiction of the court. *Corbine v. United States*, 203 Ct. Cl. 278, 488 F.2d 1008.

The burden is upon the United States to demonstrate that the court is without jurisdiction to hear a claim against a particular government agency. *Butz Engineering Corp. v. United States*, 204 Ct. Cl. 561, 499 F.2d 1018.

The Court of Federal Claims has jurisdiction in military pay cases in which the plaintiff

is seeking back pay and allowances generally. *Mitchell v. United States*, 930 F.2d 893, transf to 26 Ct. Cl. 1329, aff'd without op (CAFC) 1 F.3d 1252.

The Court of Federal Claims has jurisdiction to render judgment upon any claim against the United States founded upon any express or implied contract with the United States. 28 USC Section 1491(a)(1). This includes claims for breach of contract. *United States v. Milliken Imprinting Co.*, 202 US 168, 50 L.Ed 980, 26 S.Ct. 572.

An allegation that a contract existed or an allegation that the defendant's actions constituted a breach of contract is sufficient to withstand the government's motion to dismiss the complaint for lack of jurisdiction. *Massachusetts v. Departmental Grant Appeals Bd.*, (CA1 Mass) 819 F.2d 778; *United States v. Hopkins*, 427 US 123, 49 L.Ed.2d 361, 968 Ct 2508.

It is sufficient to come within the jurisdiction of the Court of Federal Claims if the plaintiff alleges that someone with authority to bind the government entered into a valid agreement with the plaintiff to compensate him for services rendered. *Kaplan v. United States,* 139 Ct. Cl. 682. 153 F.Supp 787.

Where a claim is based upon a breach of contract the Court of Federal Claims has jurisdiction even though the claim also alleges that the United States engaged in tortious conduct in breaching the contract. *Summit Contractors, Inc. v. United States*, 22 Ct. Cl. 54. The Court of Federal Claims has jurisdiction in an action arising primarily from the breach of a contractually created duty where the plaintiff sustained damages through the negligence of the defendant. *Bird & Sons, Inc., v. United States*, 190 Ct. Cl. 426, 420 F.2d 1051. A party can also bring an action against the government in the Court of Federal Claims in a situation where the United States converted property belonging to the plaintiff where the plaintiff claims ownership of the property by reason of a contract with the United States. *Summit Contractors, Inc. v. United States, supra*.

The Court of Federal Claims has jurisdiction to render judgment upon any claim against the United States founded upon any contract with the United States implied in fact. *United States v. Mitchell*, 463 US 206, 77 L.Ed.2d 580, 103 S.Ct. 2961.

An implied in fact contract with the government, like an express contract, requires mutuality of intent to contract, consideration, lack of ambiguity in the offer and acceptance, and actual authority on the part of the government representative to bind the government in the contract. *El Centro v. United States*, (CAFC) 922 F.2d 816. The United States must have received some consideration. *Knote v. United States*, 95 US 149, 241 F.d 442.

If consideration passes to the government the Court of Federal Claims has jurisdiction of a claim based on quantum meruit, as in the case of continued delivery of natural gas to the military after the expiration of written contracts. *Cities Service Gas Co. v. United States*, 205 Ct. Cl. 16, 500 F.2d 448.

The Court of Federal Claims also has jurisdiction to render judgment upon any claim against the United States founded upon any regulation of an executive department. The court can base an award of damages on a regulation as long as it can be interpreted as mandating compensation by the government. *Bowen v. Mitchell*, 487 US 879, 101 L.Ed.2d 749, 108 S.Ct. 2722. A published and currently enforced regulation of an executive department is a sufficient basis for jurisdiction even if it is found to be void. *Eversharp Inc. v. United States*, 129 Ct. Cl. 772, 125 F.Supp 244.

Thus it is clear that, based upon 28 USC Section 1491(a)(1) and the cases cited above, the court has jurisdiction to hear and decide plaintiff's claim for a monetary award pursuant to MCO 1650.17F based on the legal theories of the government's breach of an express or implied contract, misrepresentation, and a claim for quantum meruit. For these reasons, the government's motion to dismiss for lack of jurisdiction should be denied.

2. PLAINTIFFS' CLAIMS ARE NOT BARRED BY 10 USC SECTION 1124.

Defendant argues that plaintiffs' claims are barred by the $25,000.00 limit of 10 USC Section 1124, and that therefore the court does not have jurisdiction of plaintiffs' claims. Plaintiffs disagree.

First of all, the mathematical calculation section of MCO 1650.17F provides for awards far in excess of the $25,000.00 limit of the statute depending on the financial savings to the

government as shown by the examples noted above. Thus it appears that the Marine Corps order allows awards far exceeding $25,000.00. This order was drafted in 1986 whereas the statute had been in existence for many years prior to 1986. The plaintiffs submit that the court can therefore assume that the Marine Corps either knew or should have known of the existence of the $25,000.00 limit for beneficial suggestion awards and ignored it. Or perhaps the Marine Corps was not aware of the statute when the order was promulgated. If this was the case, the Marine Corps should have been aware of the statute. In either event, the Marine Corps misrepresented to its members the financial reward that might accrue to one or more of its members who submitted an application for a financial reward for a beneficial suggestion based on an invention or scientific achievement which benefitted the government.

In the case of the CLS, the plaintiffs will be able to show the court without too much difficulty that the financial benefit accruing to the government as a result of the CLS was, and is, in the realm of $10 million to $20 million. After the plaintiffs thought of the CLS, designed it, made a prototype, tested it, and manufactured 29 between January and June 1988, the U.S. Navy and Marine Corps immediately adopted it and put it into immediate use. It has been in continuous use ever since and has been fully adopted by the U.S. Army.

The United States has benefitted immensely from the plaintiffs' invention and the U.S. Navy, the U.S. Marine Corps, and the U.S. Army have become more combat capable.

It is the plaintiffs' position that the Marine Corps Order has the force of law and that the government is estopped to use the $25,000.00 limit because of its misrepresentation in promulgating an order in contravention of the statute noted above.

It is also plaintiffs' position that they thought of and designed the CLS on their own private time as private citizens outside of their Marine Corps Reserve drill time. They are therefore entitled to bring their claim for quantum meruit/unjust enrichment as private citizens based on the fact that the government reaped such a huge financial benefit from their invention.

The plaintiffs would also like to point out to the court that MCO 1650.17F required the government to apply for a patent for new inventions immediately upon submission and

acceptance of the beneficial suggestion. The government failed in its duty to do so. When the plaintiffs attempted to apply for a patent some months later, they were informed that their application would be turned down because the CLS was in public knowledge and in public use because the U.S. Navy and Marine Corps had adopted and put the CLS into immediate use in May and June of 1988.

The government thus had unclean hands because it did not apply for the patent as required by the order and when the plaintiffs attempted to do so, the government prevented them from obtaining a patent because the government put the CLS into immediate use. Not only did the government prevent the plaintiffs from obtaining a patent on the CLS, and misrepresent the financial awards available, but it also delayed fourteen years in making the $25,000.00 award.

The government's handling of the plaintiff' beneficial suggestion award application, and its treatment of the plaintiffs during the entire process, was totally reprehensible especially given the fact that the plaintiffs' invention was so simple, so brilliant, so effective, and so successful.

Therefore the plaintiffs submit that they have a claim as private citizens against the government based on quantum meruit/unjust enrichment for the value of their invention and the benefit accruing to the government from the CLS/LVS.

Finally, the plaintiffs submit that they have a claim both as private citizens and as U.S. Marines for an award in excess of the statutory limits based on the government's breach of an implied contract in fact for the design and manufacturing of the CLS, between them and the government, based on the Marine Corps order and the benefit accruing to the government from their invention. This claim for breach of an implied contract in fact is based upon *Griffin v. United States*, 215 Ct. Cl. 710 (1978).

The plaintiffs would ask the court to take note of the government's own recommendation of February 22, 1996 that the plaintiff's should be awarded $208,700.00 in tangible benefits, and $5,000.00 to $10,000.00 in intangible benefits because of the multi-million dollar benefits accruing to the government in savings as a result of the CLS.

## CONCLUSION

The Court of Federal Claims clearly has jurisdiction of plaintiffs' action pursuant to 28 USC 1491 and the cases cited above, based on plaintiffs' claims for breach of an express contract or contract implied in fact, misrepresentation and quantum meruit. In addition plaintiffs' claims are not barred by the $25,000.00 statutory limit because of the government's unclean hands and misrepresentation, the implied contract between the plaintiffs as private citizens, plaintiffs' claim as private citizens for quantum meruit, and the plaintiffs' reliance upon MCO 1650.17F.

For these reasons the government's motion to dismiss plaintiffs' claims because this court lacks jurisdiction should be denied.

Dated this 3rd day of February, 2006.

Respectfully submitted,

s/ Thomas J. Flaherty
Thomas J. Flaherty
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of February, 2006, I electronically filed the foregoing Plaintiffs' Response to Defendant's Motion to Dismiss with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

John S. Groat
Attorney at Law
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington D.C. 20530

and I hereby certify that I have mailed by United States Postal Service the document to the following:

John S. Groat
Attorney at Law
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington D.C. 20530

s/ Thomas J. Flaherty
Thomas J. Flaherty, OSB 74096
Attorney for Plaintiffs
3032 SE Rood Bridge Drive
Hillsboro, OR 97123
Phone: (503) 245-2500
FAX: (503) 644-8912
stahlco@teleport.com